IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| TOWNSHIP OF SPRING | : | |
| | : | CIVIL ACTION |
| v. | : | |
| | : | NO. 09-5518 |
| THE STANDARD INSURANCE CO. | : | |

**SURRICK, J.**                                                                                           **JUNE  1 , 2011**

## **MEMORANDUM**

Presently before the Court is Defendant Standard Insurance Co.'s Motion for Summary Judgment. (ECF No. 23.) For the following reasons, Defendant's Motion will be granted.

**I.    BACKGROUND**

In late September and early October of 2008, the United States equity markets experienced what commentators have called "the worst stock market crash since the Great Depression," with the benchmark Standard & Poor's 500 Index falling over 50% from its peak. Paul Krugman, *The Lame-Duck Economy*, N.Y. Times, Nov. 21, 2008, at A35. The instant lawsuit asserts claims for breach of contract and breach of fiduciary duty in which Plaintiff Spring Township seeks to recover losses suffered in October 2008 by two of its employee-retirement plans from Defendant, who served as the investment manager for the plans.

On January 27, 2003, Plaintiff and Defendant entered into two Group Annuity Contracts (the "Contracts") pursuant to which Defendant agreed to manage the assets in two of Plaintiff's employee-retirement plans: a fund for police and a fund for non-uniformed employees (the "Plans"). (*See* Contracts, Def.'s Mot. Summ. J. Exs. 1, 2, ECF No. 23; Pl.'s Resp. 1, ECF No.

24.) Although the Contracts related to two different funds, the terms of the Contracts are otherwise substantially identical. Under the Contracts, Plaintiff had access to two investment options for the funds in the Plans: the Stable Asset Fund and the Separate Account. (*See* Contract Riders, Def.'s Mot. Summ. J. Exs. 1, 2.) The Contracts advise the Township that "[y]ou (or person(s) you nominate) are the Plan Administrator who has the authority to control and manage the operation and administration of the Plan and Plan assets. We do not assume this responsibility." (*See* Contracts § VIII.A.1, Def.'s Mot. Summ. J. Exs. 1, 2.) The Contracts also specify that Plaintiff can terminate the Contracts at any time by giving Defendant written notice of termination. (*Id.* § VII.A.I.a.) However, the Contracts require that the termination date occur no sooner than 30 days after Standard receives written notice of termination. (*Id.* § VII.A.I.b.)

In early 2008, the Township Board of Supervisors initiated a review of the Plans. (Daniels Dep. 24:2-25:15, Def.'s Mot. Summ. J. Ex. 15.) On August 25, 2008, the Board of Supervisors voted to move the Plans from Defendant to Nationwide Trust Company. (Bittner Dep. 43:1-11, Def.'s Mot. Summ. J. Ex. 3; Daniels Dep. 28:22-29:8.) At the same meeting, the Board of Supervisors voted to retain The Trollinger Group to advise Plaintiff on investment matters and facilitate the transfer of the Plans from Defendant to Nationwide. (Daniels Dep. 23:9-16.) Ronald Bittner of The Trollinger Group was placed in charge of assisting Plaintiff in the transfer of the Plans from Defendant to Nationwide. (*Id.* at 31:23-32:2.) Tracy Daniels, the Treasurer for Spring Township, was responsible for overseeing the Township's pension plans and served as the primary point of contact between the Township and Standard. (*Id.* at 12:18-13:16.) Daniels relied heavily on Bittner to orchestrate the transition of the Plan assets from Standard to Nationwide. (*Id.* at 30:2-31:22.)

On September 29, 2008, the Township sent a letter to Standard informing it of the Township's intent to terminate the Contracts and transfer the assets to J.P. Morgan Chase. (*See* Termination Letter 1, Def.'s Mot. Summ. J. Ex. 13.) The termination letter instructed Standard to:

1. Liquidate all assets (100%) regardless of where they are placed.

2. On October 7, 2008, send a wire transfer for the full amount of said assets to [J.P. Morgan Chase].

(*Id.*) On October 1st, Robin Hochstetler, the employee at Standard who was responsible for directing fund transfers, informed Tracy Daniels via email that Standard was in receipt of the Township's termination letter and requested that the Township execute and return an attached contract termination request form. (10/1 Daniels Email 1, Def.'s Mot. Summ. J. Ex. 4.) The contract termination request form stated that the expected date of transfer to a new provider can be no fewer than 30 days from the date Standard receives the forms. (*Id.* at 2.) This was the first time that Bittner had heard of the 30-day termination requirement, and he referred to the Contracts to confirm the requirement. (Bittner Dep. 70:17-71:4.) Daniels faxed the completed forms to Hochstetler on October 10th. The Township listed November 7th as the date for termination, in compliance with the Contracts' 30-day requirement for notice of termination. (*See* Daniels Fax 3, Def.'s Mot. Summ. J. Ex. 6; Bittner Dep. 71:9-14 (stating that November 7th termination date was chosen to comply with 30-day notice requirement and to avoid interfering with payment of benefits on November 1st).)

In addition, Bittner emailed Hochstetler on October 10th asking her to confirm with Daniels that Standard had received the contract termination forms, "and then make sure that the

assets of both plans have been liquidated into a safe cash option in accordance with the Township's previous instructions in its first written communication dated September 29, 2008." (10/10 Bittner Email 1, Def.'s Mot. Summ. J. Ex. 7.) Bittner also noted that "[g]iven the extreme market volatility this week, these plan liquidations should have already occurred on Tuesday [October 7th], the target date directed by the Township in its termination letter." (*Id.*) Hochstetler emailed an investment directive form to Daniels and asked her to complete it with the Township's new investment mix. (*Id.*) Daniels emailed the completed investment directive form to Hochstetler the same day. (10/10 Daniels Email 1, Def.'s Mot. Summ. J. Ex. 8.) The completed forms directed Standard to allocate 100% of both Plans to the Stable Asset Fund. (*Id.* at 2-3.) Hochstetler processed the reallocation upon receipt of the completed forms on October 10th. (Hochstetler Dep. 72:9-16.)

Equity markets around the world declined precipitously between October 7th and October 10th. In those three days, the Township's police retirement fund lost $220,772.36 of its value, and the non-uniformed retirement fund lost $172,802.42. (Pl.'s Resp. 8.) Plaintiff alleges that Defendant's failure to process the liquidation of the Plans' assets on October 7th is the direct cause of these losses. (*Id.*)

## II. LEGAL STANDARD

A party is entitled to summary judgment when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the [party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); s*ee also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Fed. Home Loan Mortg. Corp. v. Scottsdale Ins. Co.*, 316 F.3d 431, 443 (3d Cir. 2003). Where the nonmoving

party bears the burden of proof at trial, the moving party may identify an absence of a genuine issue of material fact by showing the court that there is no evidence in the record supporting the nonmoving party's case. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 325 (1986); *UPMC Health Sys. v. Metro. Life Ins. Co.*, 391 F.3d 497, 502 (3d Cir. 2004). If the moving party carries this initial burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. *See* Fed. R. Civ. P. 56(e)(2) (stating that "an opposing party may not rely merely on allegations or denials in its own pleading; rather, its response must . . . set out specific facts showing a genuine issue for trial"); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (noting that the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts"). The nonmoving party may not avoid summary judgment by relying on speculation or by rehashing the allegations in the pleadings. *Ridgewood Bd. of Educ. v. N.E. for M.E.*, 172 F.3d 238, 252 (3d Cir. 1999). "Where the record taken as a whole could not lead a reasonable trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587 (quoting *First Nat'l Bank v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). "We must construe the evidence in favor of the non-moving party, and summary judgment must be denied if there exists enough evidence 'to enable a jury to reasonably find for the nonmovant on the issue.'" *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 179 (3d Cir. 2009) (quoting *Giles v. Kearney*, 571 F.3d 318, 322 (3d Cir. 2009)).

## III. ANALYSIS

Plaintiff alleges that Defendant breached its contractual and fiduciary duties to Plaintiff by failing to move the Plans' assets into a safe cash option on October 7, 2008. (*See* Am. Compl. §§ 28, 29, ECF No. 4.) Defendant contends that Plaintiff's instructions were defective and that it

5

has not breached the Contracts or any fiduciary duty it may have owed to Plaintiff. (Def.'s Mot. Summ. J. 2.)

1. **Breach of Contract**

Plaintiff maintains that Defendant's failure to move the Plans' assets into a safe cash option constitutes a breach of the Contracts. (*Id.*) Plaintiff does not cite specific provisions of the Contracts in support of this argument. Instead, Plaintiff contends that Defendant breached certain implied duties in the Contracts, including a duty of competence, a duty of diligence, and a duty of timeliness. (Pl.'s Resp. 10-11.)

In support of this argument, Plaintiff cites several cases that set forth the duties that a broker owes a client when handling a non-discretionary[1] brokerage account. (*See* Pl.'s Resp. 11-13 (citing *Merrill, Lynch, Pierce, Fenner & Smith, Inc. v. Millar*, 274 F. Supp. 2d 701 (W.D. Pa. 2003); *Kwiatkowski v. Bear, Stearns & Co., Inc.*, 306 F.3d 1293 (2d Cir. 2002); *Amendolia v. Rothman*, No. 02-8065, 2003 WL 23162389 (E.D. Pa. Dec. 8, 2003); *Consol. Sun Ray, Inc. v. Lea*, 401 F.2d 650 (3d Cir. 1968)).) However, there is nothing in these cases to suggest that these duties are implied contractual duties. These cases make it clear that the duties that are discussed are fiduciary duties owed by a stockbroker/agent to the client/principal. *See, e.g.*, *Millar*, 274 F. Supp. 2d at 708-09 (discussing fiduciary duties owed by broker to client); *Kwiatkowski*, 306 F.3d at 1302 (observing that duties owed by stockbroker to client "generally are cast in terms of a fiduciary duty"); *Amendolia*, 2003 WL 23162389, at *4 ("[T]he law in Pennsylvania is

---

[1] A non-discretionary brokerage account is an account in which the client decides where to invest his or her money. A discretionary account is one in which the broker makes investment decisions on the client's behalf. *See Merrill, Lynch, Pierce, Fenner & Smith v. Perelle*, 514 A.2d 552, 561 n.9 (Pa. Super. Ct. 1986).

unambiguous that a securities broker is an agent of the client and that an agent-principal relationship exists between the two.").[2] We are unable to find any authority, and Plaintiff has provided none, that suggests that these duties are implied contractual duties.

Plaintiff points to no provisions in the Contracts that Defendant has breached. To the extent that Defendant owed any duties to Plaintiff that are not set forth in the Contracts, they are fiduciary in nature rather than contractual. Accordingly, we will enter Summary Judgment in favor of Defendant on Plaintiff's breach-of-contract claim.

2. **Breach of Fiduciary Duty**

Plaintiff alleges that Defendant has breached its fiduciary duties by failing to liquidate the Plans in a timely manner, failing to advise Plaintiff of the procedures for liquidating the Plans, failing to act with reasonable care and diligence in responding to Plaintiff's instructions, failing to carry out Plaintiff's instructions promptly, and failing to act diligently and competently in executing Plaintiff's instructions. (Am. Compl. ¶ 28.) Defendant contends that it never shared a confidential relationship with Plaintiff such that it owed Plaintiff fiduciary duties, and that the Contracts disclaim the existence of any fiduciary relationship. (Def.'s Mot. Summ. J. 30-33.)

Under Pennsylvania law, the duties owed a non-discretionary client by a broker include:

(1) the duty to recommend a stock only after studying it sufficiently to become informed as to its nature, price and financial prognosis; (2) the duty to carry out the customer's orders promptly in a manner best suited to serve the customer's interests; (3) the duty to inform the customer of the risks involved in purchasing or selling a particular security; (4) the duty to refrain from self-dealing or refusing to disclose any personal interest the broker may have in a particular recommended security; (5) the

---

[2] *Consolidated Sun Ray* addresses the duties owed by an *insurance* broker to a client and is therefore not applicable here. Defendant's duties to Plaintiff are analogous to those of a stockbroker. *See Consolidated Sun Ray,* 401 F.2d at 601 (alleging breach of duty by insurance broker for failure to procure insurance).

> duty not to misrepresent any fact material to the transaction; and (6) the duty to transact business only after receiving prior authorization from the customer.

*Perelle*, 514 A.2d at 561 (citations omitted). In addition, the court in *Millar* implicitly recognized a duty of competence and diligence on the part of a stockbroker. *See* 274 F. Supp. 2d at 707-08 (finding that duties and competence and diligence were not the only duties defendant stockbroker owed to client). Courts have held that these duties are not exclusive. *See, e.g.*, *id.* at 708-09 (noting that the fiduciary duties set forth in *Perelle* "are not all encompassing"). *But see Kwiatkowski*, 306 F.3d at 1302 (citing cases from various jurisdictions for the premise that a broker's duties to a non-discretionary client are limited to execution of the transaction at hand).

Defendant argues that it owed no duties to Plaintiff because the two were not in a confidential relationship that would establish such duties. It is well settled, however, that an agent-principal relationship exists between securities brokers and clients. *See Amendolia*, 2003 WL 23162389, at *4 ("[T]he law in Pennsylvania is unambiguous that a securities broker is an agent of the client and that an agent-principal relationship exists between the two." ). Defendant also contends that the Contracts disclaim the existence of a fiduciary relationship. (Def.'s Mot. Summ. J. 32.) We disagree. The contractual language Defendant cites states only that "[y]ou (or person(s) you nominate) are the Plan Administrator who has the authority to control and manage the operation and administration of the Plan and Plan assets. We do not assume this responsibility." (Contracts § VIII.A.1.) This is not sufficiently definite to constitute a disclaimer of fiduciary duties. *See Levinson v. PSCC Servs., Inc.*, No. 09-0269, 2010 WL 5477250, at *14 (D. Conn. Dec. 29, 2010) (holding that contractual language stating that the account holder had not relied on the bank and would not hold the bank liable for investment performance was

insufficient to relieve bank of fiduciary duties to account holder); *cf. Hines v. FiServ, Inc.*, No. 08-2569, 2010 WL 1249838, at *3 (M.D. Fla. Mar. 25, 2010) (finding disclaimer of fiduciary relationship where contract stated that "[t]he trustee acts in a non-discretionary trustee capacity and has no fiduciary capacity or authority with respect to any matter involving the Plan or Plan assets"). Defendant was responsible for transferring the Plans' assets between investment options upon Plaintiff's request. These responsibilities are sufficiently similar to that of a broker for us to conclude that Defendant owed the same duties to Plaintiff as a stockbroker owes a non-discretionary client.

Of the duties discussed by *Perelle*, only the duty to carry out the customer's orders promptly in a manner best suited to serve the customer's interests is relevant here. *See Perelle*, 514 A.2d at 561. Plaintiff lists a number of duties, mostly without citation, which it believes Defendant owed in this situation.[3] We will limit our consideration to those duties that are firmly grounded in the case law, such as the duties discussed in *Perelle*.

Plaintiff states in its brief that "when a customer gives the fund manager *unambiguous*

---

[3] (*See, e.g.*, Pl.'s Resp. 10 ("The duty of competence requires that Standard and its employees know what they are doing and have the knowledge and resources to properly process the transactions between the Township and Standard as they arise. The duty of diligence requires that Standard respond to instructions from the Township with attention and care and to apply steady, earnest and energetic effort to executing those instructions. The duty of timeliness requires Standard to act when instructed and when it agrees to act."); 11 ("Standard has a duty to execute instructions in a timely manner."); 13-14 ("Standard owed the Township a duty to exercise reasonable skill, care, and diligence in carrying out the Township's instructions. . . . Standard had a duty to provide competent and properly trained employees to carry out the instructions of its customers, including the Township. Standard had a duty to provide appropriate resources, such as best practices manuals or policy manuals, to assist its employees in processing transactions for Standard's customers."); 17 ("Standard had a duty to communicate effectively."); 18 n.6 ("[T]he law imposes . . . a duty to provide the Township with the information necessary to fulfill the purposes of the contract.").)

instructions regarding the account, the fund manager has a duty to carry out those instructions promptly in a manner best suited to serve the customer's interests." (*Id.* (citing *Millar*, 274 F. Supp. 2d at 708-09) (emphasis added).) We agree. But unlike *Millar*, the instructions Plaintiff gave to Defendant were not unambiguous. The termination letter instructs Defendant to:

1. Liquidate all assets (100%) regardless of where they are placed.

2. On October 7, 2008, send a wire transfer for the full amount of said assets to [J.P. Morgan Chase].

(Termination Letter 1.) "Liquidate" is a term for which there are numerous definitions, any of which could apply here. Black's Law Dictionary defines "liquidate" as follows:

> 1. To settle (an obligation) by payment or other adjustment; to extinguish (a debt). 2. To ascertain the precise amount of (debt, damages, etc.) by litigation or agreement. 3. To determine the liabilities and distribute the assets of (an entity), esp. in bankruptcy or dissolution. 4. To convert (a nonliquid asset) into cash. 5. To wind up the affairs of (a corporation, business, etc.).

*Black's Law Dictionary* 1014 (9th ed. 2009). Plaintiff maintains that it intended for Defendant to liquidate the Plans' assets into a "safe cash option." (*See, e.g.*, Bittner Dep. 53:18-54:1.) However, any of the above definitions could have applied to Plaintiff's use of the word "liquidate" in this context. Without additional context, there was no way for Defendant to know that Plaintiff had sought to reallocate the assets to cash pending termination of the Contracts instead of merely performing duties incident to winding up the affairs of the Plans. Moreover, even assuming that Defendant should have understood "liquidate" to mean to convert the assets to cash, Plaintiff's failure to give a specific date on which the assets were to be liquidated rendered it reasonable to assume that the assets were to be liquidated on the day the assets were be transferred to J.P. Morgan Chase. When Plaintiff changed the termination date to November

7th to comply with Defendant's 30-day requirement for termination of the Contracts, it was reasonable for Defendant to believe that the assets were to be converted to cash on November 7th in preparation for the asset transfer.[4] Indeed, even the author of the termination letter, Ronald Bittner, did not know when he contemplated the assets being reduced to cash in relation to the termination date. (*See* Bittner Dep. 54:2-5 ("Q. And when did you think that they would be liquidated into a cash position? A. We didn't know what Standard would have done.").) If Bittner did not know when exactly the assets would be reduced to cash in preparation for transfer to another provider, surely Defendant could not be expected to know that the assets were to be reduced to cash at some point before the transfer occurred on November 7th.

It is clear from the record that Defendant received no instructions to reallocate the Plans' assets prior to October 10th. Bittner testified that October 7th was the target date to transfer the funds to J.P. Morgan—not to reallocate. (Bittner Dep. 81:20-82:4.) He also stated that "the liquidation would have had to precede the transfer in order for the transfer to have been made on the 7th." (*Id.*) But Bittner admitted that it was not until October 10th that he discussed reallocating the Plans' assets pending termination of the Contracts. (*Id.* at 84:23-85:3.) On October 10th, Defendant forwarded a reallocation form to Plaintiff, who promptly filled it out and returned it. (10/10 Bittner Email 1.) Plaintiff processed the reallocation the same day. (10/10 Daniels Email 1.) A reasonable jury could not conclude on these facts that Plaintiff gave Defendant unambiguous instructions to reallocate the Plans' assets into cash on October 7th,

---

[4] It is interesting to note that if Defendant had placed the Plans' assets in cash on October 7th and the stock market had increased between October 7th and November 7th, Plaintiff could claim, based on its ambiguous instructions, that it wanted the Plans' assets liquidated as an incident to termination of the Contracts on November 7th and could seek to hold Plaintiff liable for the lost profits.

2010.

Plaintiff also argues that Defendant had a duty to clarify Plaintiff's instructions. (*See* Pl.'s Resp. 17-20.) We are not convinced that a duty to clarify ambiguous instructions exists, particularly where, as here, the client is advised by a professional whose sole responsibility is to ensure that the transfer of assets goes smoothly. *Cf. Perelle*, 514 A.2d at 562 (holding that broker did not breach its fiduciary duty when it failed to inform client that he could seek an extension of time within which to meet the margin maintenance calls). Even assuming that such a duty exists, we do not agree that it was breached here. Given the absence in Plaintiff's instructions of a specific date for the liquidation of the Plans' assets, it was reasonable for Defendant to believe that the liquidation was incident to the Contracts' termination and was to occur contemporaneously with the transfer of the assets. If anyone had a duty to clarify that the assets were to be placed in cash on October 7th once it became clear that the Contracts would not be terminated until November, it was Plaintiff.

On this record, a reasonable jury could not find that Defendant breached its fiduciary duties to Plaintiff. Accordingly, Plaintiff's breach of fiduciary duty claim fails.

## IV. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is granted. An appropriate order follows.

BY THE COURT:

_____
**R. BARCLAY SURRICK, J.**